### DUKE v. COUNTY OF WILLIAMSBURG.

1. *Quere:* What is the proper remedy of a creditor of a county?
2. County commissioners have no powers, except such as are conferred by the constitution, or by some statute in accordance therewith.
3. A county of this state had no power in 1870 under the constitution and laws then of force, to execute bonds, without express authority of the legislature, for the purchase money of land bought for a poor farm; and bonds so executed were not valid obligations of the county.
4. But such bonds having been subsequently recognized by a joint resolution of the legislature as a part of the past indebtedness of the county which issued them, they thereupon became valid obligations of the county.
5. And a repeal of this joint resolution could not take away from the obligee his right to enforce the contract so recognized and made valid.

Before FRASER, J., Williamsburg, March, 1880.

This was an action by R. E. Duke as administrator of David M. Duke, deceased, against the county of Williamsburg, commenced in February, 1879. The opinion states the case.

*Messrs. Barron & Haynsworth,* for appellant.

*Mr. John A. Kelley,* contra.

September 9, 1884. The opinion of the court was delivered by

MR. JUSTICE McIVER. From the allegations of the complaint, which are not denied in the answer, it appears that on or about August 22, 1870, the county commissioners of Williamsburg bought from the plaintiff's intestate a tract of land for the purpose of establishing thereon a "poor farm" for said county at and for the sum of $1,614.60; that they paid a part of the purchase money in warrants on the county treasurer, which were subsequently paid by that officer, and for the balance executed the two bonds which constitute the cause of action in this case, which were made payable on the 1st day of January, 1871, with interest from date at the rate of seven per centum per annum, but

if not paid at that date, then the interest was to be at the rate of ten per centum per annum; that on June 7, 1877, a payment was made on the said bonds out of the proceeds of taxes collected the year preceding to pay the past indebtedness of the county, but that the balance due on said bonds remains due and unpaid, and that the county commissioners in office at the time this action was commenced refuse to make any payment on said bonds or to recognize them as constituting a part of the past indebtedness of the county. Thereupon the plaintiff demanded judgment against the county (1) for the balance due upon said bonds; (2) for an order requiring the county commissioners to recognize the amount due upon said bonds as a part of the legal *bona fide* indebtedness of the county, and that the same be admitted to a participation in the distribution of the taxes collected to pay such past indebtedness.

The defendant, by its answer, set up two defences. 1. That of *res adjudicata*, based upon some proceedings in *mandamus*; but as this defence does not seem to have been considered or passed upon in the Circuit Court, and the "Case," as prepared for argument here, contains no facts upon which it could be based, no further notice need be taken of it. 2. That the bonds in question were issued without any legal authority, and therefore constituted no legal evidence of any indebtedness of the county. In the court below it seems to have been contended that even if the bonds were originally issued without authority, yet they had been subsequently ratified and confirmed by subsequent legislation, which will hereinafter be more particularly noticed. The Circuit judge held that the bonds were originally issued without authority, and that the subsequent legislation relied upon did not have the effect of making them valid obligations of the county. He, therefore, rendered judgment dismissing the complaint.

From this judgment the plaintiff appeals, substantially, upon two grounds: 1. That there was error in holding that the bonds were originally issued without authority; 2. In holding that the subsequent legislation relied upon did not ratify and confirm the action of the county commissioners in issuing the bonds.

No question has been raised as to the form of proceeding in this case, and we shall not volunteer to do so. Whether a person

claiming to be the creditor of a county can bring his action in the usual form for the recovery of his alleged debt, except in such cases as the right of action is given by statute, or whether he should not submit his claim for audit to the county commissioners, from whose judgment, if unfavorable to him, he may appeal; and after he has thus established his claim, whether his remedy is not by *mandamus* to compel the county commissioners to levy a tax to pay the same, is a question upon which we prefer to reserve our judgment. See *Wheeler* v. *County of Newberry*, 18 *S. C.*, 135.

We will, therefore, upon this occasion, confine our attention to the two questions raised by the appeal. First. Did the county commissioners have any authority to issue the bonds in question? It is quite clear that the county commissioners have no powers except such as are conferred by the constitution, or by some act of the legislature passed in accordance with the provisions of that instrument. The law which was of force at the date of these bonds, and by which, therefore, the question of their validity is to be determined, is to be found in *Constitution*, art. IV., sec. 19, and the act of 1868, 14 *Stat.*, 128. The language of the section of the constitution referred to is as follows: "The qualified electors of each county shall elect three persons, for the term of two years, who shall constitute a board of county commissioners, which shall have jurisdiction over roads, highways, ferries, bridges, and in all matters relating to taxes, disbursements of money for county purposes, and in every other case that may be necessary to the internal improvement and local concerns of the respective counties: *Provided*, That in all cases there shall be the right of appeal to the state courts."

The powers thus conferred are broad and extensive, but they are not unlimited. They do not embrace the power to levy taxes, except as such power is delegated by some act of the legislature. For by section 4 of article IX. of the constitution, it is declared that "no tax shall be levied, except in pursuance of a law, which shall distinctly state the object of the same, to which object such tax shall be applied;" and by section 8 of the same article it is specially provided that "the corporate authorities of counties, townships, school districts, cities, towns, and

villages may be vested with power to assess and collect taxes for corporate purposes.'' Accordingly we find that it has been the uniform practice ever since the adoption of the constitution for the legislature to make special provision each year authorizing the county commissioners to levy the taxes necessary for county purposes.

Nor are the provisions of section 19, above quoted, sufficiently extensive to confer upon the county commissioners unlimited power in providing for the support of the poor, for by section 5 of article XI. the constitution provides that ''the respective counties of this state shall make such provision *as may be determined by law* for all those inhabitants who, by reason of age and infirmities or misfortunes, may have a claim upon the sympathy and aid of society'' (the italics being ours). Accordingly, at the first session of the general assembly after the adoption of the constitution, in the act of 1868 above cited, authority was given to the county commissioners to purchase land and erect buildings for the poor, and very soon thereafter, to wit: on February 28, 1870 (14 *Stat.*, 369), another act was passed authorizing the county commissioners, in pursuance of the authority conferred by the said act of 1868, to provide with said buildings ''sufficient tillable land to give employment to such persons, able to work, as may come upon the county for support; and said buildings and land shall be known as the Poor House and Farm of said county.''

It having been thus ''determined by law'' the provision which the county commissioners should be authorized to make for the support of the poor, it is only necessary for us to inquire what was the extent of the authority thus conferred upon the county commissioners. For this purpose, we must look to the first, second, and third subdivisions of section 14 of the act of 1868, above cited, together with the *proviso* at the end of the section. The language is as follows: ''The boards of county commissioners shall have power, and they are hereby authorized: 1. At any meeting thereof lawfully assembled to purchase, for the use of their respective counties, any real estate necessary for the erection of buildings and for the support of the poor of such county. 2. To fix upon and determine the site of any such buildings, and cause to be erected necessary buildings for Poor House, and pre-

27

scribe the manner of erecting the same. 3. To borrow money for the use of such county, to be expended for the purchase of any real estate, or for the erection of any such buildings, and to provide for the payment thereof, with interest, by tax upon such county, within ten years from the date of such loan, in yearly instalments or otherwise: * * * *Provided*, that no such loan shall be created by the county commissioners until they notify the general assembly of the necessity thereof, and authority be granted by them to create said loan."

These being the terms in which the authority was vested in the county commissioners to purchase the property necessary for the establishment of a "Poor House and Farm," the practical inquiry in this case is, whether the county commissioners of Williamsburg county, in purchasing land for a Poor Farm from the plaintiff's intestate, and giving the bonds in question, complied with the terms thus prescribed; for unless they did, their action was without any legal authority, and the bonds do not constitute legal obligations of the county. It will be observed that the terms prescribed contemplate but two modes by which such a purchase could be made: first by cash and second by borrowing the money necessary to pay the price agreed upon; and a purchase on a credit in the usual form does not seem to have been contemplated or provided for. It is quite certain that they did not adopt the first mode contemplated (buying for cash), and if the mode which they did adopt can be construed as practically the second, and that they borrowed the money from their vendor with which to pay the price agreed upon, and that the bonds in question were given to secure the payment of the money so borrowed, then it is equally certain that they have failed to comply with one of the terms upon which the authority to purchase was conferred, and that, too, one of the most important, inasmuch as it is conceded that no notification of the necessity for such loan had been made to the general assembly, and no authority for the creation of such loan granted.

It is obvious that the purpose of this restriction upon the powers of the county commissioners was to prevent them from fixing upon the county a debt for the purpose indicated, unlimited in amount, until the necessity for the same had been made

to appear to the legislature, and their authority for creating such debt had been obtained. The wisdom of such a purpose is apparent, especially when the means of paying such debt—by taxation—was entirely under the control of the legislature. We agree, therefore, with the Circuit judge that the bonds in question were originally issued without legal authority, and hence did not then constitute valid obligations of the county.

The only remaining inquiry is, whether, by any subsequent legislation, these bonds have been rendered valid. The legislation relied upon for this purpose is the act of March 3, 1874 (15 *Stat.*, 580), authorizing and directing the county commissioners of Williamsburg to levy and collect a special tax, from year to year, until a certain specified sum was collected, to be applied exclusively to the payment of the past indebtedness of said county; and a joint resolution, approved March 2, 1876 (16 *Stat.*, 210), by which the bonds sued on in this case were in express terms recognized, and the county treasurer directed to register them, and that the same be paid, as a part of the past indebtedness of the county, as provided for by the act of 1874, above cited. Inasmuch as the only vice in the original issue of these bonds was the want of legislative sanction for such issue, it would seem to follow necessarily that this express recognition of them operated as a confirmation, and healed any infirmity there might have been in their original issue, and that they are, therefore, now valid obligations of the county, unless there is some other objection to their payment not disclosed in the present proceedings.

The respondent, however, contends that the only effect of this legislation was to entitle these bonds to their *pro rata* share of the fund raised by the act of 1874; and that this they have already received. We do not so regard it. The validity of these bonds depends upon the question whether they were issued by proper authority, and although such authority was wanting at the time of their issue, the subsequent recognition of them by the legislature must necessarily be regarded as a confirmation of the previously unauthorized act of the county commissioners in issuing them.

Again, the respondent contends that the joint resolution of 1876 was impliedly repealed, though he cites no act upon which

he relies as having such effect. We presume he alludes to the act of March 18, 1878 (16 *Stat.*, 494), entitled "An act to adjust the past indebtedness of Williamsburg county," which makes provision other than that furnished by the act of 1874 for the payment of the past indebtedness of the county, and which, in its last section, repeals all acts and parts of acts conflicting with it. This, it is contended, necessarily repealed the act of 1874, and that the joint resolution of 1876 fell with it. Even granting this to be so, we do not see how it could affect the question under consideration. The repeal of the act of 1874 might very well take away the means provided for paying the past indebtedness of the county and substitute therefor the means provided by the act of 1878, but it certainly could not have the effect of annulling any of such past indebtedness. So that even if the legislature had undertaken, in express terms, to repeal the joint resolution of 1876, it could have no effect in annulling any debt created or recognized by it, as such repeal would be clearly in violation of the provisions of the constitution both of this state and the United States, forbidding the passage of any law impairing the obligation of contracts. We think, therefore, that the Circuit judge erred in holding that the subsequent legislation referred to did not have the effect of making the bonds in question valid obligations of the county.

The judgment of this court is that the judgment of the Circuit Court be reversed, and that the case be remanded to that court for a new trial.

MR. JUSTICE MCGOWAN concurred generally, but MR. CHIEF JUSTICE SIMPSON only in the result.